554 So.2d 596 (1989)
Diane B. MOZEE, As Personal Representative of the Estate of Marvin Mozee, III, Appellant,
v.
CHAMPION INTERNATIONAL CORPORATION, Appellee.
No. 88-1723.
District Court of Appeal of Florida, First District.
December 20, 1989.
Rehearing Denied January 25, 1990.
James R. Green, of Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, Pensacola, for appellant.
Robert P. Gaines of Beggs & Lane, Pensacola, for appellee.
*597 WILLIS, BEN C. (Ret'd), Associate Judge.
The plaintiff-appellant seeks reversal of a summary final judgment in behalf of the defendant-appellee, Champion International Corporation (hereafter referred to as Champion), in a wrongful death action involving the electrocution of plaintiff's decedent while he was performing work in removing asbestos from Champion's building in the course of being demolished. Plaintiff's decedent, Marvin Mozee III (hereafter referred to as Mozee) was, at the time of his death, an employee of A & A Insulation, Inc. (hereafter referred to as A & A), which was a subcontractor of Brown & Root, which held a contract with Champion to demolish an old building that housed a paper mill, whose use had been discontinued since 1980 or 1981. A & A's subcontract was for the removal of asbestos from the building.
While Mozee was situating himself to facilitate removal of asbestos, he came in contact with a charged electrical line and was electrocuted.
The building involved was built prior to World War II and when the paper mill operation was discontinued, much of the electrical power to the building was shut off. Also in the building was a crane that was on small wheels that traveled on elevated I-beams and was used primarily as a maintenance tool. This crane was powered by electricity.
Kemper, a chemical engineer, was employed by Champion as a maintenance engineer, and among his duties was to be Champion's contact with the contractor for the asbestos removal. Kemper made daily checks with the various contractors performing work on Champion's property to ascertain their progress, and for the purpose of answering questions and giving information that was pertinent. He would receive reports of asbestos that had been removed and discuss plans for the next area of asbestos removal. Sam Mitchell was A & A's superintendent.
Prior to starting the asbestos removal, A & A asked Champion to cut off all nonessential electricity, but was told that some of the wiring was so old that no schematic diagrams were available and they were unable to determine which wires were hot and where the cutoff switches were located. Kemper told Mitchell that A & A was to assume that all electrical wiring was still hot.
Mitchell requested that A & A be permitted to operate the crane to use as a work platform to get to certain asbestos areas. The crane was operable and was used to raise and lower men and equipment. There was other electrical equipment that was still operating in the building, including an air compressor that supplied compressed air to the general mill and pumps that supplied water to the bleach plant.
The fatal accident occurred while Mozee was standing on a ladder that was attached to the side of a paper machine and was removing asbestos from a corner of a tank. At that time, Lewis, a fellow employee, was standing on top of the paper machine, fifteen to twenty feet above the ground. Coleman, another fellow employee, was on top of a duct, ten to twenty feet away from Mozee. Both Lewis and Coleman had observed a sign that stated "Danger, 440 Volts," which was above the I-beam and cables, but Mozee could not see the sign on the cables from his position. Lewis called to Mozee to watch out for the wires. Mozee turned and looked at Lewis as if he were trying to hear what Lewis was saying. Tragically, at that moment he touched the wires with fatal consequences. Prior to the Lewis call to Mozee, Coleman, after seeing the danger sign, told Lewis to warn Mozee not to touch the line. It was in response to Coleman's request to him that Lewis tried to warn Mozee. The men were wearing full face masks, which made hearing difficult. The charged wire was one of three uninsulated wires or cables that ran alongside one of the I-beams. It carried 440 volts of electricity.
Mitchell knew that one of the lines was "hot" because on two occasions, other employees had been shocked.
It is well established in Florida law that an owner who hires an independent contractor is generally not liable for injuries *598 sustained by that contractor's employees. Crawford v. Florida Steel Corp., 478 So.2d 855 (Fla. 1st DCA 1985); Van Ness v. Independent Construction Co., 392 So.2d 1017 (Fla. 5th DCA), rev. denied, 402 So.2d 614 (Fla. 1981); City of Miami v. Perez, 509 So.2d 343 (Fla. 3d DCA 1987).
There are, however, two principal exceptions to this rule. First, an owner may be held liable if he interferes or meddles with the job to the extent of assuming the detailed direction of it, and thus become the master of the independent contractor's employee. Second, if the owner has been a passive non-participant, in order to impose liability one or more specific identifiable acts of negligence, i.e., acts either negligently creating or negligently approving the dangerous condition resulting in the injury or death to the contractor's employee, must be established. City of Miami v. Perez, supra; Conklin v. Cohen, 287 So.2d 56 (Fla. 1973).
A person who is having work done on his premises by an independent contractor and has actual or constructive knowledge of latent or potential dangers on the premises owes a duty to give warning of, or use ordinary care to furnish protection against, such dangers to employees of the contractor and subcontractor who are without actual or constructive notice of the dangers. See Florida Power & Light Co. v. Robinson, 68 So.2d 406 (Fla. 1953), citing 57 C.J.S. Master & Servant § 606.
The duty of the owner to give notice and warn of a dangerous condition known to the owner but unknown to the independent contractor and its employees is discharged by notice given to supervisory personnel by the independent contractor. Horton v. Gulf Power Co., 401 So.2d 1384 (Fla. 1st DCA 1981); City of Miami v. Perez, supra.
An owner will not be responsible for a contractor's safety violations in situations where an owner's representative was present at the construction site for the purpose of assuring that the contractor complied with the plans and specifications for the construction. Skow v. Dept. of Transportation, 468 So.2d 422 (Fla. 1st DCA 1985); City of Miami v. Perez, supra.
The trial court concluded that there was no showing that defendant interfered, meddled, or assumed any control or direction regarding work to be performed other than periodically inspecting the progress of the work. It seems abundantly clear that Champion did not come within the exception to the rule of owner non-liability to injuries to an independent contractor's employees when the owner interferes or meddles with the job to the extent of assuming the detailed direction of it. No real contention is made that such exception has any basis in this case.
The real thrust is that, though Champion was a passive non-participant in the work, it nevertheless had a dangerous condition on the premises for which it had given inadequate warning to the subcontractor or its supervisory personnel. The trial judge concluded that under the circumstances Champion adequately informed the contractor of the existence of electrical lines in the building and to assume that they were hot, and the contractor's supervisor knew of the existence of hot lines in the building and especially those lines servicing the overhead crane.
The trial court also referred to the case of Florida Power & Light Co. v. Robinson, supra, which plaintiff relied upon. In that case, liability was found to exist in a power company that employed an independent contractor to remove some bad poles. An employee of the contractor was injured when a pole he was climbing gave way due to its rotten condition below ground level. In that case the power company knew or had the means to know of the existence of this condition, but the contractor nor its employee had knowledge of it. In that case it was held that merely stating that the poles were bad was deemed inadequate notice. The trial court here deemed the case was distinguishable and that under all circumstances Champion had given all the information it had and that other facts known to the subcontractor and its employees alerted them to the dangers present.
*599 The trial court also commented on an affidavit of a professional engineer expert to the effect that there were violations of the National Electrical Code, which requires crane runway contact conductors to be guarded in a manner that persons cannot inadvertently touch energized current-carrying parts. The court observed that the code had not been adopted by Escambia County until 1984 and the building was built before World War II. It was also stated that applicability of the code is a matter of law outside the witness's expertise and created no issue at all. Without commenting on the witness qualifications, it is obvious that the dangerous condition was known to be present, and violations of a code, even if applicable, did not create an issue of fact as to the adequacy of notice of the danger to A & A's supervisory personnel.
It is concluded that the trial court's summary judgment is supported by the record and it is accordingly AFFIRMED.
THOMPSON, J., concurs.
SMITH, J., dissents with opinion.
SMITH, J., dissenting with opinion.
I respectfully dissent. Although I agree with the majority opinion's statement of the controlling law, I disagree with its application under the facts here to uphold the summary judgment. Champion knew or was charged with knowledge of the existence of this concealed wire charged with 480 volts of electricity, and knew that absent warning of the wire's existence and the potential danger, a worker could inadvertently come into contact with it during the course of his work. It is undisputed, moreover, that the representative selected by Champion to consult with the independent contractor  and to give such warning of dangers on the premises as might be necessary  was himself unaware of the existence of the hidden and extremely lethal danger represented by this highly charged concealed wire.
I think a jury issue was presented whether the warning given to A & A's superintendent, Mitchell, by Champion's representative, Mr. Kemper, to simply "assume all wires are hot," was adequate under the circumstances. Whether Champion discharged its duty to warn by so notifying the decedent's employer is rendered doubly suspect by Champion's failure to determine that its own representative, assigned to act as its contact with Mozee's employer, was fully informed of the potential dangers which workers on the project would be subjected to. There is additional evidence of negligence on the part of Champion in its failure to eliminate the extremely hazardous but not readily apparent condition by the simple expedient of cutting off the unneeded electric current, which the evidence shows could have been done (and A & A's supervisor said should have been done) by throwing one switch. Instead, Champion assigned a representative to oversee A & A's work who, by his own admission, did not know the location of the proper switch and who made no effort to seek the assistance of other Champion personnel who did know.
It seems axiomatic that the adequacy of a warning must be determined in relation to the magnitude of the danger warned against. Lewis v. Gulf Power Company, 501 So.2d 5 (Fla. 1st DCA 1986). At the very least, before granting summary judgment on the grounds that a warning was sufficient as a matter of law, there should be a showing that the person assigned to give the warning was adequately informed and qualified to exercise the judgment delegated to him. That does not appear to be the case here, and I do not believe the record thus far developed in this case permits a determination as a matter of law that Champion was without fault in contributing to the accident.